UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
-----------------------------------------------------------------X
SCOTT LANIN AND LISA LANIN,

                              Plaintiffs,
              v.


THE BOROUGH OF TENAFLY, and THE
TENAFLY BOARD OF EDUCATION,

                              Defendants.
-----------------------------------------------------------------X

RECEIVED

MAY 0 8 2012

AT 8:30_____M
Case No. WILLIAM T. WALSH, CLERK

_12-_J72 5 (ES)_

JURY TRIAL
DEMANDED

## COMPLAINT

Plaintiffs, Scott Lanin and Lisa Lanin (the "plaintiffs" or "Lanins"), as and for their

complaint against defendants the Borough of Tenafly (the "Borough"), and the Tenafly Board of

Education (the "Board of Education") herein respectfully allege and say, as follows:

### PRELIMINARY STATEMENT

1.      This civil rights action raises the ancient question "quis custodiet ipsos custodes?" or "who

watches the watchmen?"  It exposes how the Borough and the Board of Education have engaged in a

pervasive pattern of unconstitutional practices with respect to the plaintiffs' home and surrounding

area, oppressed the politically powerless plaintiffs, and deprived them of their fundamental rights to

the freedom of movement, free speech, due process and equal protection, among other things.

2.      This action begins with the plaintiffs' claim for declaratory and injunctive relief to restore

their fundamental freedom of movement – their right to exit their home when they choose - and their

right of egress on Downey Drive, the only adjoining public street.  The plaintiffs challenge the

Borough's traffic Ordinance 10-19, as applied to them, which was adopted without direct or actual

notice.  Since September 2010, the Borough made Downey Drive one-way instead of two-way and

eliminated the plaintiffs' westbound egress from their home during 8am to 4pm on school days.  The

1

plaintiffs and eight other families previously had the ability to exit their homes and drive west on Downey Drive, away from the Tenafly J. Spencer Smith Elementary School (the "Smith School") and its heavy traffic and crowds of children by the front of the school. The school calls this traffic a "carpool" even when there is no ride sharing. All eastbound egress is also cut off each school day with traffic cones during drop-off and dismissal times at the Smith School.

3.     For the plaintiffs and eight families, the abutting public street is shut down in both directions twice a day, every school day, 180 days per year, leaving them landlocked. At these times, the Borough makes Downey Drive a "no-way" street where the plaintiffs' only exit is an involuntary trip on to Smith School property. This trip requires the plaintiffs to leave the public street and enter the Board of Education's road directly in front of the school where there are crowds of young children, merge into the school traffic (two or three lanes of vehicles that merge into one), and then drive through the school parking lot. This trip forces the plaintiffs to enter into a dangerous situation, substantially increases their risk of accident or injury, diminishes the utility and marketability of their home, and interferes with their fundamental right to freely move out of their home when they choose to on the adjoining public street. Plaintiffs face traffic fines if they exit their home and drive west on the adjacent public street as they used to do.

4.     Nearly every school day, the plaintiffs are faced with the Hobson's choice where restricted egress through the school's property and parking lot is really no egress at all and the plaintiffs can no longer exit their home by car when they want to or need to. Plaintiffs would never have purchased their home had they known that the Borough would do this to them. The Borough refuses to restore the plaintiffs' rights. A map of the plaintiffs' property and the surrounding area and a copy of the Borough's online zoning map are incorporated by reference and are collectively annexed hereto as Exhibit "A".

2

5.      Under the strict scrutiny that must be applied here to the deprivation of the plaintiffs' most basic right to exit their home, Ordinance 10-19 should be declared invalid as applied to the plaintiffs. The Borough has no compelling interest and has not tailored its laws narrowly to justify the substantial interference. Although the Borough has recently restored two-way traffic on a limited portion of Downey Drive for homeowners who have never been deprived of the freedom of movement and the right of egress, it has continued its disparate treatment of the plaintiffs.

6.      Ironically, the Smith School credo hanging on its front wall reminds us to "Treat Others The Way You Would Want Them To Treat You". Yet, the plaintiffs face restrictions on when and how the plaintiffs they can exit their home, that the mayor, council members, and school board members would never personally tolerate themselves.

7.      Another traffic Ordinance, 10-20, also adopted by the Borough without actual or direct notice to plaintiffs, eliminated parking on the upper portion of Downey Drive and shifted more vehicles to the lower portion of Downey Drive directly in front of plaintiffs' home. Ordinances 10-19 and 10-20 (the "Traffic Ordinances") have collectively increased the burden on the street beyond its reasonable capacity and shifted the burden away from other streets that connect to the school which formerly shared this burden. The Borough also shifted parking from the south side of Downey Drive to the north side in front of plaintiffs' home. As a result, plaintiff's rights of egress and ingress, and access to their home by visitors and emergency vehicles, has been substantially impaired and interfered with. Plaintiffs seek injunctive relief to restore their ability to exit their home using the adjacent public street.

8.      The Traffic Ordinances, as applied to the plaintiffs, violate a multitude of constitutional rights. They impose a restriction on the freedom of movement and right of egress on the plaintiffs and eight other families that is not shared by any other property owner in the entire Borough of

3

Tenafly and, therefore, violate the plaintiffs' right to Equal Protection under the Fourteenth Amendment to the U.S. Constitution.

9.      The Traffic Ordinances were passed without actual or direct notice to the plaintiffs even though the Borough knew they would interfere with access to plaintiff's home and the homes of eight other families, and violated plaintiffs' right to procedural Due Process under the Fourteenth Amendment.

10.     The Traffic Ordinances go too far, are arbitrary, and do not advance any legitimate government purpose. They increased traffic while causing an overall net decrease in parking in the immediate neighborhood. They cause residential and commercial traffic to enter school property. They are not the least intrusive method available to advance whatever governmental purpose may be claimed and, therefore, violate the plaintiffs' substantive Due Process rights under the Fourteenth Amendment.

11.     The Traffic Ordinances are an unreasonable seizure of the plaintiffs' right to access their home and their right of way and easement to use the abutting public street, in violation of the plaintiffs' Fourth Amendment rights.

12.     The Traffic Ordinances are a taking of a private right for a private purpose without just compensation in violation of the Fifth Amendment. They shifted the collective burden of the school "carpool" traffic and parking to the plaintiffs and several other families and diminished the value and marketability of their homes for the convenience of a small identifiable group of parents who park on Downey Drive, while increasing the value and marketability of several homes on other nearby streets that no longer share the burden for the school traffic or parking, without any real benefit to the public at large.

13.     Plaintiffs also bring a related challenge arising from the defendants' failure to supervise and safeguard school children in an alleged right of way on Downey Drive and in the adjacent creek.

4

The plaintiffs are parents of schoolchildren and are very concerned about child safety. It is foreseeable that the defendants' breach of their duties of care will result in serious injury or drowning. This action raises the issue of whether the Borough possesses a right of way, whether the school can use it for school purposes instead of its own property, and if so, whether the defendants are responsible to supervise and safeguard children in it and to remove snow and maintain it. Plaintiffs allege that the Borough does not possess a right of way, that even if it does, the right of way cannot be used for school purposes instead of the Board of Education's own property, and that, in any event, the defendants are responsible for it once they place children in a position of danger without supervision.

14.     Over the objection of residents, the defendants took control of an alleged right of way on the south side of Downey Drive to build a "sidewalk" that connects the Smith School to a creek approximately 250 feet away. Mischaracterized as a sidewalk, it is really a concrete platform that abruptly ends five homes away from the school, just past the creek. The platform is in fact an off-site extension of the Smith School that was actually designated by signage as a "Student Drop-Off Pick Up Zone" for vehicles. Few students actually walk to the Smith School on Lower Downey Drive.

15.     The switch to a one-way traffic pattern was supposed to be temporary until construction of this loading/unloading zone was completed, but once that happened, the Borough failed to restore two-way traffic. Defendants' conduct belies their pretense of child safety. The defendants have never actually allowed parents to park next to the new "sidewalk" and walk their children to and from school. Instead, parents are required to park on the opposite side of the street (north side) while the "sidewalk" is used for loading and unloading from the school's "carpool" traffic. Minor children are also released by the school each day and are allowed to walk and play on this "sidewalk" without supervision. The "sidewalk" leads them directly to the creek, a dangerous rocky area in a FEMA

5

Flood Zone that poses a serious risk of injury or drowning. Copies of the FEMA Flood Zone maps for this portion of the creek are incorporated by reference and collectively annexed hereto as Exhibit "B". School children play in the creek all the time with no adult supervision. The defendants have made no provision for supervision or for the removal of snow, ice or debris in this zone. Instead, the school board has sought out parental waivers in an attempt to evade its responsibilities and shift the school board's liabilities and costs to a few homeowners.

16.     The defendants' policies are irrational. They jointly created the dangerous conditions they complain about. They jointly sought construction of a "sidewalk" on the south side of lower Downey Drive but then shifted parking to the north side of the street. To reach this "sidewalk", children must now walk right through traffic. When children do use it, both defendants disavow all responsibility, leaving those unattended children to their own devices. The school board uses this off-site property and then claims that it is not responsible because it is off-site. It obtains waivers from parents so that a few private residents are left to insure the safety of the school children, rather than the school itself.

17.     In 2011, as the Borough was preparing to build this "sidewalk" but before starting construction, the Borough hired Urbana Consulting, LLC ("Urbana Consulting") to "study" the school traffic and make recommendations, including whether a sidewalk was even needed. Urbana expressed concern about the dangers posed to people in the street but did not realize that the Borough had just created the problematic traffic configuration less than a year before. If the Borough had left parking on the south side of lower Downey Drive (as it was before Ordinance No. 10-19), parents could park next to the new "sidewalk" and walk to the school with their children without crossing through traffic. If the Borough had left parking on the upper part of Downey Drive (as it was before Ordinance 10-20), parents could park and safely walk to school with their children in the area where plaintiffs' easterly egress is cut off by traffic cones.

6

18.     The defendants have created other dangerous conditions as well. The Board of Education already has a playground behind the plaintiffs' home that it inexplicably constructed next to a busy parking lot and along the creek. With alarming frequency, the playground lures unattended children to play in the creek (the midpoint of which is the plaintiffs' west boundary line) and to trespass on the plaintiffs' backyard and side yard. Now, the defendants threaten to expand their danger zone to the plaintiffs' front yard on the north side of Downey Drive, with a second "sidewalk" that will also connect the Smith School to the creek.

19.     The defendants' actions violate the plaintiffs' right to Equal Protection under the Fourteenth Amendment. Plaintiffs are part of a protected class of similarly situated property owners east of Engle Street in Tenafly who live in a homogeneous neighborhood. Under the Borough's Master Plan, as mandated by state law, the Borough's state goal is to clearly delineate residential and non-residential uses of property and create buffers between the two. Defendants have singled out plaintiffs and several other homeowners for different treatment by attempting to increase their liabilities and responsibilities for a non-residential use of the property around their homes.

20.     The school board is also violating its duty to supervise children at dismissal and arrival times, both on and off school grounds, under the New Jersey State standards set forth in the landmark case of Jerkins v. Anderson, 191 N.J. 285 (N.J. Sup. Ct. 2007). Plaintiffs seek an injunction to enjoin the defendants from building a loading/unloading zone in front of their home, to compel them to use other available less-intrusive methods to achieve their stated goal of child safety, including using the Board of Education's own property, and to supervise children properly. Plaintiffs seek a declaration that parental waivers or releases obtained by the school board are void and unenforceable as against public policy.

21.     Plaintiffs also seek a declaratory judgment that the Borough has acted ultra vires and in violation of New Jersey State law by illegally constructing the "sidewalk" in the protected 50 foot

7

riparian zone of[9] the creek.  To accomplish this, the Borough filed a false application with the New Jersey Department of Environmental Protection and misrepresented the nature of the construction which involved adding fill or grading (in violation of the 0% net fill rule) and adding impervious concrete surface in a riparian zone of a protected waterway near plaintiffs' home that was not previously disturbed.  Plaintiffs seek an injunction directing the Borough to restore the riparian zone to its natural state.

22.     Plaintiffs also dispute the defendants' use of the alleged right of way where the Borough constructed the "Student Drop-Off Pick Up Zone".  Plaintiffs seek a declaratory judgment that ordinances and actions taken based on the alleged right of way, including Ordinance 10-22 and Resolution A-3, are invalid for several reasons because the Borough: (a) did not obtain any such right of way in 1951 from the original owners Charles H. Reis and Margaret J. Reis, their estate or heirs and there is a cloud on title, (b) cannot clearly define the boundaries of the alleged right of way which is not designated on the Borough's street or zoning maps, (c) has failed to accept the alleged right, or (d) has had any right of way extinguished by abandonment and/or adverse possession, if it did exist.

23.     Plaintiffs also challenge Ordinances 10-19 (one-way traffic), 10-20 (parking) and 10-22 (sidewalk) and any other ordinances and resolutions that were adopted with newspaper notice and without direct or actual notice to the plaintiffs, which directly affect the homes of the plaintiffs and only a few other readily identifiable families, as legally insufficient to satisfy minimum standards of Due Process under the Fourteenth Amendment to the U.S. Constitution as set forth in the leading case of Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306 (1950).  There is a long history of the defendants taking actions where they knew that only the plaintiffs and a few other families would be adversely affected, yet they have repeatedly and deliberately refused to give actual or direct notice in order to avoid public scrutiny.  This surreptitious behavior is pervasive in Tenafly's

8

government and continues to this day. Under these circumstances, any newspaper notice that may have been given pursuant to state law was not reasonably calculated to apprise the plaintiffs and other readily identifiable residents and give them a fair opportunity to respond or object to proposed actions. Plaintiffs seek to void actions taken without direct notice which directly affected their rights and to compel the defendants to provide direct notice in the future.

24.     In the context of this dispute, the Borough went further beyond the pale and deprived the plaintiffs and other families of their First Amendment right to Free Speech at public meetings. In an attempt to manipulate and control the message heard by the public, and to evade scrutiny over their actions, the Borough banned the plaintiffs and others from speaking about the interference with their freedom of movement and their concerns for child safety.

25.     It is and was the official policy of the Borough to routinely censor and ban Free Speech at public meetings based solely on the anticipated content of speech or the ideas and unfavorable opinions that certain residents might espouse. At public meetings, the Borough forced residents, including plaintiffs, to have ad hoc impromptu elections to designate individuals to speak for a "group" designated by the Mayor. The Mayor lumped residents from Downey Drive and the surrounding neighborhood into one group involuntarily based on their opposition to the "sidewalk", combining the families who have suffered interference with their freedom of movement and rights of egress with other families who have suffered no similar deprivation of rights, and required the appointed "representative" to speak for the entire "group", despite residents' diverse concerns and desire to speak for themselves. The Borough's interference with an essential freedom under our system of government is shocking and would normally remain "under the radar" since there is no watchdog or compliance officer at the municipal, county or state level to monitor or prevent this from happening.

9

26. Plaintiffs also seek an injunction directing the defendants to identify and disclose any ordinances and resolutions that were adopted or passed, or which are or will be under consideration, if they affect or will affect plaintiffs' property or the surrounding area. Plaintiffs allege that the adoption of Ordinance 10-22 and any other similar ordinances that are currently unknown to the plaintiffs were, at least in part, the result of the Borough's Free Speech and Due Process violations.

27. Plaintiffs also seek to invalidate Ordinances 10-19, 10-20 and 10-22 and related school board resolutions because the Borough and the Board of Education have conflicts of interest that tainted and voided the entire process in violation of N.J.S. Title 18A Education – 18A:12-24, entitled "Conflicts of Interest" and the school board's own By-Laws. Board member John Teall owns a home that is located quite literally right in the middle of this dispute. Despite his direct personal and pecuniary interest in the use of the alleged right of way and traffic issues, he was allowed to participate in and vote on matters which directly affect his home and the plaintiffs'. As early as 2004, there were designs to construct the school sidewalk in front of Mr. Teall's home, but that never happened. The defendants made decisions together through a Joint Use Committee and breached fiduciary duties to plaintiffs and other residents by ignoring this clear conflict with the School Board.

28. In addition, the Borough's Mayor and Council usurped the role of the Planning Board and of the Zoning Board of Adjustment, bypassed all of their usual procedures and standards to consider a nonconforming use or variance, failed to give any of the usual notices to plaintiffs and nearby neighbors within 200 feet, acted as both an applicant and decision-maker, and ignored their fiduciary duties to protect the rural character and aesthetics of the neighborhood under the Borough's Master Plan, among things.

29. Plaintiffs also challenge the report of the Borough's agent Urbana Consulting about the Smith School "carpool" traffic problem for many reasons. The Borough, in its written bid

10

solicitation, rigged the results of the "study" by actually directing the conclusion that the Borough

was looking for. The Borough also violated state law in the bidding and solicitation process with

improper contacts with bidders. The "study" was flawed because only two days in the Spring were

"studied" and all data from the winter of 2010-2011 (when the police declared a two month snow

emergency and eliminated parking on Downey Drive) was omitted. Urbana Consulting has

suggested adding unknown amounts of impervious surface area without regard to known flooding

conditions. Urbana Consulting has ignored environmental limitations, including the protected 50

foot zone in the riparian banks of the creek. Urbana Consulting suggested continuing the one-way

traffic configuration that infringes on the plaintiffs' fundamental freedom of movement, rights of

egress and ingress, and access to their home. Urbana Consulting ignored the danger the creek poses

to children and the creation of an attractive nuisance by constructing artificial man-made conditions

around a creek that is never supervised by Smith School or Borough personnel. Remarkably,

Urbana Consulting and its sub-consultant both professed ignorance of the fact that the defendants are

actually routing all commercial traffic on to school property. In forming its opinion, Urbana

Consulting also failed to recognize that its employer (the Borough) and the Board of Education

created the dangerous conditions in the first place just one year before.

30.     On the other hand, the Board of Education has completely ignored Urbana Consultant's

recommendations that require the school board to assume some responsibility to reduce its own

traffic and to safeguard its own schoolchildren, such as staggered dismissals and arrivals or

constructing a drop-off pick up zone next to the Smith School's own parking lot.

31.     The climax of the defendants' pattern of unconstitutional behavior occurred in June

2011 when the Borough and Board of Education conducted a quasi-judicial hearing at a

public meeting to review Urbana's recommendations under the pretense of being fair and

open. As usual, plaintiffs were not given direct written notice of the hearing but did attend

11

since they were aware of it. The hearing was distinctly adversarial. The Borough and the Board of Education were jointly in favor of one set of recommendations and the plaintiffs were in favor of another.

32.     The hearing was a constitutional abomination that perverted all concepts of justice. The Borough's executive and legislative branches ignored the separation of powers and acted ultra vires as a "kangaroo court". The Mayor made rulings as a judge and the Council deliberated as a jury. In a clear conflict, the Borough sat as the arbiter of its own joint plans with the Board of Education, while its partner, the Board of Education, was a party. The Borough was not impartial, had no written procedures, followed no evidentiary rules or judicial procedures, had no pre-hearing disclosure of witnesses or evidence, considered unsworn testimony and hearsay without allowing objections or cross-examination, did not allow experts to be questioned in voire dire (on their qualifications or bias), and allowed the Mayor and Council to question witnesses while denying plaintiffs the same right. The Borough violated plaintiffs' right to Free Speech and Equal Protection by allowing the Mayor, members of the Council and School Board, and their Joint-Use Committee, and/or other residents, to speak directly with Urbana Consulting before the hearing, while denying plaintiffs' request for the same opportunity. The Borough's private communications with Urbana Consulting before the hearing were in the nature of witness tampering and ex parte communications where the Borough considered evidence that it later failed to disclose or make part of the record. The Council then decided to accept the recommendations that continued the deprivation of the plaintiff's constitutionally protected rights. Plaintiffs were left with no opportunity to appeal. This Federal Court is now the last bastion of hope to protect the plaintiffs' rights and the integrity of the U.S. Constitution.

33.     Based on this and the totality of the circumstances, plaintiffs assert that the Borough

and the Board of Education jointly conspired to deprive plaintiffs of their rights, and should

each be held responsible, without regard to which defendant may have committed the actual

infringement.  The results of the quasi-judicial hearing should be vacated and set aside.

34.     Plaintiffs also challenge the constitutionality of the Borough's snow removal and sidewalk

repair ordinances (General Ordinances 12-3.1 and 12-3.2) as applied to the plaintiffs and on their

face.  The defendants seek to build another concrete platform in the alleged right of way abutting

plaintiffs' property but to exculpate themselves from any responsibility for it.  Plaintiffs seek a

declaration that these ordinances do not apply to the plaintiffs because they are "grandfathered" or

exempt since they purchased a home in a neighborhood that uniformly has no sidewalks except for

main thoroughfares and New Jersey State law specifically imposes no duty on residential

landowners to remove snow, even where there is an abutting sidewalk.  The threatened selective

enforcement of Ordinances 12-3.1 and 12-3.2 violates the plaintiffs' right to Equal Protection and

should be enjoined.   This limited ruling will have no impact on any sidewalk other than the

proposed one at issue here.  It will also have no impact on safety since the defendants can easily

satisfy safety concerns by removing snow themselves from any platform they may construct as an

extension of the school.

35.     The defendants' attempt to make plaintiffs' solely responsible for the expense of removing

snow, ice, and debris from a new partial "sidewalk" and for the expense of repairing and maintaining

it, and to make plaintiffs primarily liability for injuries that occur on it, <u>when the plaintiffs do not</u>

<u>currently have these expenses or liabilities,</u> is also a disguised property tax hike that requires the

plaintiffs to subsidize the School Board's budget.  Under the Borough's statutory scheme, upon the

failure to remove snow, the Borough can remove the snow itself and assess the cost against the

plaintiffs' home as an actual "part of the taxes to be assessed" which "shall bear the same interest as taxes" contrary to the plaintiffs' existing rights. This stealth tax is very much a real tax.

36.     Ordinances 12-3.1 and 3.2 should also be declared facially invalid. They threaten plaintiffs with potential tax liens and criminal penalties under a highly questionable statutory scheme that allows for the Mayor and Council to once again act as judge and jury without notice or any opportunity for a hearing in violation of citizens' rights to Due Process and Equal Protection.

37.     Plaintiffs also seek a declaratory judgment that the Borough has engaged in inverse spot zoning by isolating the plaintiffs and a few residents from the rest of the neighborhood and that the Borough's online zoning map is erroneous because it incorrectly designates the plaintiffs' property as an "O" zone (Open Space for the school) instead of an "R10" residential zone. Plaintiffs seek related injunctive relief to prevent the defendants from taking actions based on this.

38.     Plaintiffs also seek to enjoin future violations of the New Jersey Open Public Meeting Act to prevent the Borough and the Board of Education from conducting public business in secret by email and/or in closed session.  In response to requests made under the Open Public Records Act for the defendants' emails concerning the traffic, "carpool", "sidewalk" issues and related matters within the scope of their official duties, the defendants issued blanket refusals. The Borough stated that it would have to search through "5,000,000" emails and the Board of Education stated that it would have to search through "hundreds of thousands" of emails, thus confirming their practice of using email to avoid public scrutiny.

39.     Plaintiffs also seek to compel the defendants to fix the drainage in the Smith School parking lot which routinely floods on to the plaintiffs' backyard during storms.  Urbana Consulting recommended adding substantial impervious surface area both behind and in front of the plaintiffs' home without any engineering "study" or remediation or disclosure about the impact on flooding.

40.    Plaintiffs also seek to enjoin the defendants from proceeding with construction activities that will displace substantial but unknown quantities of soil, to disclose the amount of soil that has been or will be displaced, and to compel them to restore the lands in and around plaintiffs' home to the extent that such activities already occurred in violation of the Soil Erosion and Sediment Control Act N.J.S.A. 4:24-39.

41.    Plaintiffs also seek to enjoin a threatened violations by the defendants of the Americans with Disabilities Act (the "ADA") arising out of (1) their refusal to remove snow, ice and debris from their new proposed "sidewalk", an intended public "facility under 28 C.F.R. 35.133, and (2) the impaired ability of emergency vehicles to reach the plaintiffs' home.

## THE PARTIES

### The Plaintiffs

42.    Plaintiffs Scott Lanin and Lisa Lanin are married individuals residing in the Borough of Tenafly, County of Bergen, in the State of New Jersey, and are owners of certain real property known as Lot 2202 in Block 25 on the Tax Map of the Borough also commonly known by the street address of 83 Downey Drive, Tenafly, New Jersey 07670.

43.    Plaintiffs bring this action in their individual capacities as homeowners and as taxpayers and citizens of the United States and the Borough of Tenafly, in the State of New Jersey and as parents of minor children who currently attend or have recently attended Smith School.

### The Defendants

44.    Upon information and belief, at all relevant times mentioned herein, the defendant Borough is and was a body politic of the State of New Jersey, Borough of Tenafly with offices located at 100 River Edge Road, Tenafly, New Jersey 07670.

45.    Upon information and belief, the Borough has at all relevant times described herein conducted official business through its mayor and council members set forth below.

46.     According to the Borough's website, "the Mayor is the chief executive officer and the six council members handle legislative functions." See, http://www.tenaflynj.org/content/7596.

47.     Upon information and belief, at all relevant times mentioned herein, defendant Board of Education is and was a public agency formed under the laws of the State of New Jersey in the Borough of Tenafly with an office for the transaction of business at 500 Tenafly Road, Tenafly, New Jersey 07670.

48.     Upon information and belief, the Board of Education has at all relevant times described herein conducted its official business through its board members set forth below and its superintendent of schools, as its chief executive officer.

**The Tenafly Mayor And Council**

49.     Upon information and belief, at all relevant times mentioned herein, Peter Rustin is and was an individual residing in the Borough of Tenafly, County of Bergen, in the State of New Jersey, at the street address of 295 Woodland Street Tenafly, New Jersey 07670, owner of two homes in the Borough, and the mayor of the Borough (the "Mayor").

50.     Upon information and belief, at all relevant times mentioned herein, Michael Lattif is and was an individual residing in the Borough of Tenafly, County of Bergen, in the State of New Jersey, at the street address of 138 Serpentine Road. Tenafly, New Jersey 07670, and a member of the Council of the Borough (the "Council").

51.     Upon information and belief, at all relevant times mentioned herein, Jon Warms is and was an individual residing in the Borough of Tenafly, County of Bergen, in the State of New Jersey, at the street address of 11 Walnut Drive, Tenafly, New Jersey 07670, and a member of the Council.

52.     Upon information and belief, at all relevant times mentioned herein, Anthony Barzelatto is and was an individual residing in the Borough of Tenafly, County of Bergen, in the State of New

Jersey, at the street address of 65 Day Avenue Tenafly, New Jersey 07670, and a member of the Council.

53.     Upon information and belief, at all relevant times mentioned herein, Nadia Lamastra is and was an individual residing in the Borough of Tenafly, County of Bergen, in the State of New Jersey, at the street address of 42 Dean Drive Tenafly, New Jersey 07670, and a member of the Council.

54.     Upon information and belief, at all relevant times mentioned herein, Martha Kerge is and was an individual residing in the Borough of Tenafly, County of Bergen, in the State of New Jersey, at the street address of 40 Hillside Avenue Tenafly, New Jersey 07670, and a member of the Council.

55.     Upon information and belief, at all relevant times mentioned herein, Barry Honig is and was an individual residing in the Borough of Tenafly, County of Bergen, in the State of New Jersey, at the street address of 151 Deerfield Drive Tenafly, New Jersey 07670, and a member of the Council.

56.     The aforementioned members of the Council are sometimes hereinafter referred to collectively as the Council.

**The Members Of The Tenafly Board Of Education**

57.     Upon information and belief, at all relevant times mentioned herein, Phyllis Perskie-Kesslen is and was an individual residing in the Borough of Tenafly, County of Bergen, in the State of New Jersey, at the street address of 31 Park Street, Tenafly, New Jersey 07670, and a member of the Board of Education.

58.     Upon information and belief, at all relevant times mentioned herein, Richard Press is and was an individual residing in the Borough of Tenafly, County of Bergen, in the State of New Jersey, at the street address of 116 W. Clinton Avenue, Tenafly, New Jersey 07670, and a member of the Board of Education.

59.     Upon information and belief, at all relevant times mentioned herein, Mark Aronson is and was an individual residing in the Borough of Tenafly, County of Bergen, in the State of New Jersey,

at the street address of 220 Buckingham Road, Tenafly, New Jersey 07670, and a member of the Board of Education.

60.     Upon information and belief, at all relevant times mentioned herein, Sam Bruno is and was an individual residing in the Borough of Tenafly, County of Bergen, in the State of New Jersey, at the street address of 65 Ivy Lane Tenafly, New Jersey 07670, and a member of the Board of Education.

61.     Upon information and belief, at all relevant times mentioned herein, Donald H. Kaplan is and was an individual residing in the Borough of Tenafly, County of Bergen, in the State of New Jersey, at the street address of 145 Stonehurst Drive Tenafly, New Jersey 07670, and a member of the Board of Education.

62.     Upon information and belief, at all relevant times mentioned herein, Edward Salaski is and was an individual residing in the Borough of Tenafly, County of Bergen, in the State of New Jersey, at the street address of 9 Lawrence Parkway Tenafly, New Jersey 07670, and a member of the Board of Education.

63.     Upon information and belief, at all relevant times mentioned herein, Alexandra Spyridaki is and was an individual residing in the Borough of Tenafly, County of Bergen, in the State of New Jersey, at the street address of 35 Depeyster Avenue, Tenafly, New Jersey 07670, and a member of the Board of Education.

64.     Upon information and belief, at all relevant times mentioned herein, Lynne Stewart is an individual residing in the Borough of Tenafly, County of Bergen, in the State of New Jersey, at the street address of 7 Ravine Road Tenafly, New Jersey 07670, and a member of the Tenafly Board of Education.

65.     Upon information and belief, at all relevant times mentioned herein, Jonathan Teall is and was an individual residing in the Borough of Tenafly, County of Bergen, in the State of New Jersey,

at the street address of 110 Downey Drive Tenafly, New Jersey 07670, and a member of the Tenafly Board of Education.

66.     The aforementioned members of the Board of Education are sometimes referred to collectively as the Board of Education.

67.     The defendants have previously received actual and/or constructive notice of the claims herein by email, letter and/or statements made at public meetings.

### JURISDICTION

68.     This action seeks to vindicate rights protected by the United States Constitution including plaintiffs' fundamental right to the freedom of movement to exit their home when they choose, access to their home, and their rights to Free Speech under the First Amendment, Due Process and Equal Protection under the Fourteenth Amendment, their rights against unreasonable seizures under the Fourth Amendment, and against a taking under the Fifth Amendment, and is brought under 42 U.S.C. Section 1983 (sometimes hereinafter referred to as "Section 1983"). The wrongful actions of the defendants described below were the official custom and policy of the Borough and the Board of Education, persons susceptible to suit under Section 1983, and were done under the color of law in derogation of plaintiffs' rights.

69.     The case presents a federal question and the Court has jurisdiction over this action pursuant to 28 U.S.C Section 1331(a) as an action arising under the US Constitution; 28 U.S.C. Section 1343(a)(3) to redress the deprivation of rights protected by law and by the US Constitution; and under 28 U.S.C. Section 1343 (a)(4) to secure equitable or other relief to protect civil rights. This Court has jurisdiction pursuant to 28 U.S.C. Section 2201 and 2202 to declare the rights of the parties and to grant all further relief found necessary and proper.

70.     Venue is proper in this court pursuant to 28 U.S.C. Section 1391(b) because this action is filed in the judicial district where all parties reside. The Court has supplemental and ancillary

jurisdiction over the state law claims pursuant to 28 U.S.C 1367(a) because the other claims are so related to the federal claims in the action that they form part of the same case or controversy.

71.     Plaintiffs seek declaratory, injunctive, and monetary relief.

## BACKGROUND

### The East Hill Of Tenafly And The Smith School

72.     Upon information and belief, the neighborhood at issue in this action came into existence in or about 1951.  The general area is often referred to as the "East Hill" of Tenafly and includes the land east of Engle Street (a north-south public street in Tenafly).

73.     The general zoning and lot sizes make the East Hill area homogeneous and gave plaintiffs a reasonable expectation that they would be treated fairly and similarly to other residents in the neighborhood.

74.     The dispute at issue arises out of meetings and ordinances concerning elementary school "carpool" traffic on Downey Drive of parents who drop off or pick up their schoolchildren at the Smith School.

75.     The Smith School is located at 111 Downey Drive in the Borough of Tenafly in the State of New Jersey.

76.     The children that attend the Smith School are in grades Kindergarten through 5th grade and are generally between the ages of 5 and 11 years old.

77.     Defendant Board of Education and its members and employees are responsible for the Smith School and for the safety and supervision of the children that attend Smith School.

78.     The Smith School was constructed approximately 60 years ago and is bounded or approached by several other roadways, including Oak Street, an east-west running street which connects from

Engle Street, and Leroy Street, a north-south street which runs along the entire back entrance to the Smith School.

79.    Downey Drive is an east-west public street which runs from Engle Street.

80.    Thatcher Road, a north-south public street in the Borough, intersects with Downey Drive at a point between Engle Street and the Smith School to form a "T" intersection due west of the Smith School.

81.    Upon information and belief, the Smith School is known on the Borough's tax map as Block 2202, Lot 13, a lot owned by the defendant Board of Education ("Lot 13").

82.    Lot 13 is improved by a one-story school building.

83.    Lot 13 includes the Board of Education's paved road and traffic circle directly in front of school building.

84.    Lot 13 includes the Smith School parking lot.

85.    Lot 13 includes a children's playground behind plaintiffs' home, and undeveloped land bordering the school parking lot and bordering Thatcher Road.

86.    The Smith School's parking lot is sometimes used as a hangout for parked cars and loitering individuals during non-school hours.

87.    Plaintiffs have seen used condoms, used female sanitary napkins, and empty alcohol containers in the Smith School lot.

88.    The Smith School's parking lot is a large impervious surface paved with asphalt.

89.    The Smith School parking lot has poor or no drainage along its southern border near the plaintiffs' property and it regularly floods on to the plaintiffs' backyard during storms.

90.    Student enrollment has increased at Smith School over the years according to public statements made by members of Board of Education.

91.     Upon information and belief, several years ago an addition was built to expand the Smith School which increased the size of the student body and the volume of traffic on Downey Drive.

92.     Upon information and belief, in addition, the Board of Education has at various times also shifted schoolchildren from the other three elementary schools in Tenafly to the Smith School and has thereby increased the size of the student body and the volume of traffic on Downey Drive.

93.     Upon information and belief, the Board of Education has not taken any steps to fully use its own property for parking, "carpool" traffic, or for the drop-off or pick up of children, although it has available land that could be used for these purposes, including undeveloped land that abuts the entire northern border of an unnamed driveway that leads out of the parking lot to Thatcher Road and undeveloped land on the western border of Lot 13 along Thatcher Road.

**The Residents On Downey Drive And In The Community**

94.     For purposes of this action, Downey Drive is sometimes referred to as: "Upper Downey Drive" meaning that portion of the street between the intersection of Oak Street and Leroy Street, or "Lower Downey Drive" meaning that portion between Engle Street and the Smith School.

95.     Plaintiffs are residents on Lower Downey Drive who are directly affected by the Smith School "carpool" traffic and the conduct of the defendants described herein.

96.     In the context of this dispute and as it is used at the Smith School, the term "carpool" refers to the vehicular traffic of parents who drop off and pick up their children both on and off of the school grounds, even when such vehicles are not actually used to share rides.

97.     The Board of Education has caused the Smith School "carpool" to run in an easterly direction along the south side of Lower Downey Drive.

98.     Other streets including Upper Downey Drive, Oak Drive, South Park, Leroy Street and the school's own property could equally serve as the main artery for the "carpool" traffic.

22

99.    The "carpool" traffic often extends from Smith School on Downey Drive towards Engle Street.

100.    Plaintiffs' home is on the north side of Lower Downey Drive between Thatcher Road and the Smith School.

**The Board Of Education's Duty To Supervise And Keep Smith School Students Safe**

101.    It is settled law in New Jersey under the landmark case of <u>Jerkins v. Anderson</u>, 191 N.J. 285 (N.J. Sup. Ct. 2001), that the Board of Education has a duty to assure the safety and care of Smith School students during drop-off and dismissal, even off of school grounds.

102.    A school board may violate this duty not only by its actions but also by its failure to act.

103.    If a school board releases a child without further supervision into a foreseeably hazardous setting it had a hand in creating, the school board is responsible.

104.    Younger children have a significant risk of harm without supervision because they do not appreciate or understand dangers and they have a proclivity to act impulsively.

105.    For many years, it has been the de facto policy of the defendant Board of Education to use an alleged and disputed right of way on the south side of Downey Drive as an extension of the Smith School property off school grounds as a "Student Drop-Off Pick Up Zone" (the "Student Drop-Off Pick Up Zone") and to try to shift its duties, costs, and liabilities to a few homeowners.

106.    Young children have been routinely dismissed and/or dropped off in the Student Drop-Off Pick-Up Zone without school supervision.

107.    The Board of Education allows children to walk in the Student Drop-Off Pick Up Zone in search of their parents in or near the moving vehicles by the school's "carpool" lane without supervision.

108.    The Board of Education has sought waivers and/or releases from parents to allow for children to be left unsupervised at drop-off and dismissal times.

23

109.    The Board of Education has publically sought the construction of the Student Drop-Off Pick Up Zone under the pretense of child safety while avoiding its responsibility to supervise and safeguard children in it.

110.    No residents on Lower Downey Drive have been given the opportunity to obtain parental liability waivers and/or releases from the parents of school children.

111.    Plaintiffs and other nearby residents are equally entitled to obtain the same protection against liability that the Board of Education enjoys for injuries that may occur to unsupervised students in or near their home during drop-off and dismissal times.

112.    The Board of Education fails to fully use or effectively use its own property for dismissal, drop-off, the "carpool", and/or parking, including the full length of the property in front of Smith School and a traffic circle, the existing sidewalk in the school parking lot which runs from Thatcher Road directly to the Smith School and undeveloped land on Lot 13 along the parking lot driveway and also along Thatcher Road.

113.    A substantial portion of the Smith School's undeveloped land could be used for parking and/or the dismissal and arrival of children but the Board of Education refuses to use it.

114.    The Board of Education fails to protect Smith School children from dangerous conditions during drop-off and dismissal in its off-site Student Drop-Off Pick Up Zone, including moving "carpool" traffic, snow and ice, and slippery rocks and water in the creek that intersects Downey Drive.

115.    The Board of Education does not insure or indemnify the plaintiffs and residents for injuries to children that may result from a lack of school supervision, including slip and falls and drowning, and for fines or tax liens that may result from the failure to remove snow in off-site Student Drop-Off Pick Up Zone.

116.    The Board of Education does not allow children to assemble in the school gym during drop-off and dismissal times, except during extreme weather conditions, thus causing parents to want to park and wait outside with or for their children, resulting in increased traffic on Downey Drive near plaintiffs' home.

117.    Upon information and belief, since September 2010 it has been the defendants' policy to advocate, condone and direct the use of Lower Downey Drive for school "carpool" traffic, parking, and commercial traffic - all at the same time.

118.    No other adjacent street that feeds into the Smith School has this burden.

**Plaintiffs Have A Protected Property Right To Use Downey Drive –**
**The Public Street That Abuts The Front Of Their Properties**

119.    It is settled law in New Jersey and throughout the country, that an abutting landowner has a protected property right and special right of way for ingress and egress between his or her property and the public street in front of his home.

120.    Access to property is an integral part of the rights of property ownership.

121.    When access to a property is adversely changed in a significant way or lost because of governmental action, the owner's ability to use the property is restricted.

122.    A lack of ingress and egress to a road abutting a property renders the property unmarketable.

123.    Upon information and belief, Downey Drive was a two-way street for nearly 60 years since it was created, until September 2010.

124.    Downey Drive is the only public road abutting the plaintiffs' driveway and home.

125.    All easterly traffic on Downey Drive has been cut off twice each day with traffic cones during the peak morning and afternoon school hours.

126.    Despite the obstruction of easterly traffic, the plaintiffs, since acquiring their home in August 2005 and until September 2010, could still leave or enter their driveway by car to and from the west on Downey Drive without any legal restrictions.

127.    As owners of a property abutting Downey Drive, a public road, the plaintiffs have significant and constitutionally protected rights by virtue of such ownership, including a right of ingress and egress that attaches to their land and a right of way, easement, or easement by prescription, to use Downey Drive to connect to other public streets without driving through the Board of Education's front entrance and parking lot.

128.    Plaintiffs have a right of access to their home so that fire trucks, ambulances, and police can reach their home in the event of an emergency.

129.    The plaintiffs have the right to be able to access emergency medical services by driving their own family members freely from their home to a medical facility, without obstruction or interference.

130.    Plaintiff Scott Lanin has had juvenile diabetes since 1978, wears an insulin pump and monitors his own blood sugar throughout the day and, therefore, has a special and legitimate concern about the potential need for emergency health care, in addition, to all of the other usual reasons why access to emergency services is critical.

131.    Plaintiff Scott Lanin is an individual with a disability that is protected by the Americans with Disabilities Act.

**Traffic Ordinance No. 10-19 Deprived Plaintiffs Of Egress On The Abutting Public Street**

132.    In or about June 2010, the Borough enacted ordinances or created traffic regulations, laws, or rules that obstruct with, interfere with, and block access to the plaintiffs' home, interfere with the plaintiffs' right of way of ingress and egress, access to Downey Drive, the only public road in front of their home.

133.    Upon information and belief, the Borough adopted Ordinance No. 10-19 on 6/22/10 which amended Section 7-23 entitled "One-Way Streets" of the Revised General Ordinances of the Borough of Tenafly, Entitled "Traffic", to provide that Lower Downey Drive would become a "one-

way" street from "Engle Street to Board of Education Property at Smith School, School Days only, 8am – 4pm."

134.    Upon information and belief, also adopted at the same time was Ordinance No. 10-20 which amended Section 7-15 entitled "Parking Prohibited during Certain Hours on Certain Streets" of the Revised General Ordinances of the Borough of Tenafly, to remove parking on the north side of Upper Downey Drive, "from the easterly beginning of Oak Street continuing east a distance of 250 feet."

135.    Plaintiffs were never directly notified about the Traffic Ordinances prior to their adoption.

136.    The effect of the Traffic Ordinances on Lower Downey Drive was not apparent until around September 2010 when the school year started.

137.    Copies of the Traffic Ordinances were obtained by the plaintiffs from the Borough only after plaintiffs made a formal written request under the Open Public Records Act.

138.    Ordinance No. 10-19 made Lower Downey Drive a "one-way" only street heading eastbound for 8 hours daily from 8AM to 4PM during school days, Monday through Friday.

139.    Ordinance 10-19 does not mention or account for the fact that all eastbound traffic on Downey Drive is already cut off twice each school day.

140.    Ordinance No. 10-19 has substantially deprived the plaintiffs of a right of egress that they and the prior owners of their home had for 61 years.

141.    Ordinance 10-19 has substantially diminished the value of plaintiff's home and their ability to use and enjoy it.

142.    There are only two (2) potential egress routes for the plaintiffs to leave their home via the adjoining municipal roadway and reach another public street by car: (1) west on Downey Drive to Thatcher Road or Engle Street, both public streets (the "West Route") or (2) east on Downey Drive to Upper Downey Drive (the "East Route").

27

143.   Prior to September 2010, the plaintiffs and eight other families enjoyed the West Route with no restrictions.

144.   Ordinance No. 10-19 eliminated the West Route during peak hours on weekdays during the school year from September to June.

145.   The East Route is obstructed twice each school day.

146.   The only other possible school day egress for the plaintiffs during arrival and dismissal times is to travel east on Downey Drive and on to Board of Education property, first towards the front of the school on the Board of Education's road and then through the Smith School parking lot (the "Board of Education Road and Parking Lot Route"), a route that the plaintiffs would never choose to use voluntarily just to leave their home.

147.   The Board of Education Road and Parking Lot Route is a time-consuming circuitous trip which requires that the plaintiffs (a) merge into or try to avoid the moving "carpool" traffic, and cars entering or leaving parking spots, (b) drive directly towards the Smith School, leave a public street and enter the school's road by its front entrance, where there are crowds of young children and teachers, (c) drive through the school parking lot, (d) drive behind the plaintiffs' own home and backyard, and (e) exit via an unnamed school driveway that leads to Thatcher Road.

148.   Ordinance 10-19, as applied to the plaintiffs, cuts off their access to the public road that abuts their home and involuntarily forces them to enter the Board of Education's road and then to enter the Smith School parking lot in order to leave their home during school hours.

149.   Ordinance 10-19, as applied, deprives the plaintiffs of egress from their land via Downey Drive, the only adjoining public roadway.

150.   Ordinance 10-19, as applied, deprives plaintiffs of reasonable access to their land.

151.    Since September 2010, plaintiffs face the risk of traffic ticket or fine if they travel west on Lower Downey Drive to exit their home during school days between 8am and 4pm as they used to do.

152.    The Borough has forced, and continues to force, the plaintiffs to take the Board of Education Road and Parking Lot Route several times per week during the school year since September 2010 or to not leave their home at all during dismissal and arrival times at school.

153.    The involuntary trip towards the school, on to the Board of Education's road, and then through the school parking lot, forces the plaintiffs to enter into a dangerous situation, substantially increases their risk of accident, injury and liability, diminishes the utility and marketability of their home, and interferes with their fundamental right to freely move out of their home when they choose to on the adjoining public street.

154.    In order to avoid the risks, liabilities and emotional anxiety associated with the Board of Education Road and Parking Lot Route, plaintiffs have been forced to remain in their home during drop-off and dismissal times on school days and wait for easterly access on Downey Drive to open up after the school drop-off and dismissal are completed.

155.    Since the school drop-off and dismissal times are times when the plaintiffs need to exit their home each day by car, the interference with their ability to do so is a substantial deprivation of their fundamental freedom of movement.

156.    Except for the plaintiffs and eight neighboring families affected by Ordinance 10-19, no other Tenafly resident is forced to drive through a school's road and parking lot to exit their home or to wait until a certain time of day to exit their home via the sole adjoining public street.

157.    Ordinance 10-19 advances no legitimate governmental purpose.

158.    Ordinance 10-19 interferes with the reasonable expectations the plaintiffs had when they acquired their property that they and their visitors would be able to (a) travel in and out of their

29

driveway on Downey Drive to a connecting public street in at least one direction at all times, and (b) access the property under the conditions that existed before the ordinance was effective.

159. Ordinance 10-19 substantially diminishes the value of plaintiffs' home and renders it less desirable than other comparable properties on the East Hill.

160. The deprivation, obstruction, impairment and interference by the defendants with plaintiffs' freedom of movement, right of egress, right of way and easement from their home occurred without Due Process in violation of the Fourteenth Amendment and is an ongoing Unreasonable Seizure in violation of the Fourth Amendment to the U.S. Constitution.

161. The Borough's interference with the plaintiffs' right of way and easement to use the adjoining public street to connect to other public streets is an ongoing trespass.

162. Upon information and belief, in or around March 2012, the Borough restored two-way traffic on a portion of Lower Downey Drive between Thatcher Road and Engle Street and removed the one-way street sign that was at the corner of Downey Drive and Engel Street, or caused it to be removed.

163. The Borough's partial restoration of two-way traffic on Lower Downey Drive occurred without any direct or actual notice to the residents on the street, including the plaintiffs.

164. The Board of Education also failed to inform parents of school children that two-way traffic has been restored on part of Lower Downey Drive.

165. The defendants' failure to notify residents and parents of school children of a significant traffic pattern change on Lower Downey Drive is reckless and unsafe.

166. The property owners whose homes are affected by the partial restoration of two-way traffic on Lower Downey Drive were never landlocked, were never deprived of their freedom of movement and egress and were never forced to drive to take the Board of Education Road and Parking Lot Route to exit their homes.

167.    The partial restoration of two-way traffic to the part of Lower Downey Drive between Thatcher Road and Engle Street, do not resolve the deprivation of the plaintiffs' rights.

168.    There is now two-way traffic on all of Upper Downey Drive and Lower Downey Drive except for an isolated zone that the defendants have created in the middle of Downey Drive (between Thatcher Road and the Board of Education's road in front of the Smith School), where the plaintiffs and eight other families reside, and where both westerly or easterly egress is cut off on the public street during dismissal and arrival times on all school days.

**The Defendants Have Created Dangerous Driving Conditions On Downey Drive**

169.    Defendants have created dangerous conditions on Lower Downey Drive.

170.    As a result of the defendants' actions and policies, the plaintiffs are obstructed from safely exiting their driveway during school hours.

171.    During school arrival and dismissal times, Lower Downey Drive is utilized beyond its reasonable capacity or at least beyond the burden placed on any other street that connects to the Smith School.

172.    During school arrival and dismissal times, Lower Downey Drive is utilized more than any other street that also leads the Smith School.

173.    It is a precarious maneuver for plaintiffs to safely exit their driveway during certain times without causing an accident due to the conditions which were created by the defendants.

174.    In the event of an emergency, vehicles such as fire trucks, ambulances, and police will be obstructed and delayed from reaching the plaintiffs' home during certain times of day as a result of the defendants' actions.

175.    The Tenafly Police have openly stated that fire trucks will have a problem passing through Downey Drive. See, Minutes of the Board of Education 8/24/10 at page 5.

31

176.    Garbage trucks, mail trucks, delivery vehicles and landscapers are and have been obstructed and delayed from reaching plaintiffs' home during certain times of the day as a result of the defendants' actions.

177.    During school dismissal and arrival times, there is usually a school bus parked in front of the Smith School, many children walking around, and parents and teachers crossing from the parking lot to the front of the Smith School directly in front of all traffic.

178.    The parked bus that is frequently in front of the Smith School leaves only a single narrow lane for three lanes of traffic (including, for example, all "carpool" traffic of parents, and all non-school traffic from Downey Drive residents, commercial vehicles, landscapers, moving trucks, FedEx and UPS delivery trucks, mail trucks, Poland Spring delivery trucks, contractors, and ambulettes) to travel on to the Board of Education's road and pass directly in front of the Smith School and to converge and flow into the school's parking lot.

179.    The front of the Smith School has the highest concentration of young children walking around as compared to any other Smith School entrance or area.

180.    The Board of Education Road and Parking Lot Route substantially increased the plaintiff's risks and potential liability for accident or injury as compared to the West Route when Lower Downey Drive was previously two-way.

181.    The Board of Education Road and Parking Lot Route forces plaintiffs to potentially violate state traffic laws prohibiting passing a parked school bus.

182.    The plaintiffs and eight other families are forced to involuntarily take the Board of Education Road and Parking Lot Route in order to exit their homes during dismissal and arrival times.

183.    Every other resident in the Borough of Tenafly, including the Mayor, Council members, and School Board members, can avoid the Board of Education Road and Parking Lot Route at all times if they so choose.

184.    The Board of Education Road and Parking Lot Route through the Smith School lot requires

that the plaintiffs drive on to the Board of Education's property which begins directly in front of the

Smith School, at the point where the Board of Education's road intersects with Lower Downey

Drive.

185.    The asphalt road in front of the Smith School has the misleading appearance of being part of

a public street (Downey Drive) because the black-top asphalt continues between the two contiguous

areas and is not divided by any signage or markings to delineate where the Board of Education's Lot

13 begins and where Downey Drive ends.

186.    According to the Borough's street map, the entire asphalt area in front of the Smith School

(including the traffic circle and the area to the immediate north) is owned by the Board of Education

and is part of Lot 13.

187.    As a consequence, the drivers of vehicles that approach Lower Downey Drive from Upper

Downey Drive and are forced on to the Board of Education's property directly in front of the Smith

School during the hours of 8am to 4pm on school days are not even aware that they have left the

municipal road and are actually on school property before they enter the parking lot.

188.    The Tenafly Police do not control the traffic or enforce signage on the Board of Education's

property, including the part of the "street" that is directly in front of the Smith School and the school

parking lot to the north.

189.    The area in front of the Smith School and in its parking lot is an unregulated area.

190.    The Joint Use Committee has suggested that the Board of Education deed the parking lot to

the Borough so that the police can enforce any restrictions in the Smith School's parking lot. See,

Minutes of Joint Use Committee Meeting 4/12/10.

33

191.    Upon information and belief, the Joint Use Committee itself was not aware that the police also cannot enforce restrictions directly in front of the Smith School, which is not part of Downey Drive or any public street.

192.    The Board of Education has rejected the Joint Use Committee's suggestion that it deed the school parking lot to the Borough.

193.    The Board of Education's road directly in front of the Smith School and its parking lot remain within the exclusive control of the Board of Education.

194.    The Board of Education Road and Parking Lot Route requires that after entering on to the Board of Education's property in front of the school, the plaintiffs must head north where there is a stop sign and frequently also a school bus that is loading or unloading children.

195.    The Board of Education Road and Parking Lot Route requires that after passing the first stop sign, the plaintiffs continue north into the Smith School parking lot, and then turn left (west) through the parking lot toward Thatcher Road where there is a second stop sign.

196.    Only after passing through this second stop sign do the plaintiffs reach and have full access to Thatcher Road, a public road, after they leave their home.

197.    Until September 2010, plaintiffs had direct and free egress to Thatcher Road from their home traveling west on Downey Drive and never had to drive through the Board of Education Road and Parking Lot Route at any time.

198.    The defendants have created and/or advocated a dangerous traffic system where every single vehicle, including all non-school and commercial traffic, must enter and exit Board of Education property under the guise of "child safety."

199.    There is an existing sidewalk abutting the Smith School parking lot which connects directly to the school but the Board of Education claims that it is unsafe to use for the dismissal or drop-off of children.

200.    The Board of Education could reverse the flow of its "carpool" traffic and have cars enter the driveway in its own parking lot from Thatcher Road where children in the back seat of their parent's cars could be safely dropped off directly at the Smith School's front entrance or even in a new loading/unloading zone adjacent to the parking lot, but the Board of Education refuses to use its own property for this.

201.    The Board of Education alleges that its own parking lot is unsafe to use for drop-off and dismissal, for children to use the existing sidewalk, or for carpool traffic.

202.    Since the Smith School parking lot is deemed unsafe by the Board of Education, the plaintiffs should not be forced to use it either.

203.    The Board of Education Road and Parking Lot Route places increased potential liabilities on the plaintiffs for injuries that might occur from driving towards the Smith School and young children every day when the plaintiffs formerly could exit their home by driving away from the school.

204.    The Board of Education previously used the traffic circle on its own property in the front of the Smith School for drop-off and dismissal of students.

205.    The Board of Education could continue to use its own property in and around the traffic circle but refuses to do so, thus increasing traffic on Lower Downey Drive.

206.    The Board of Education could use Oak Street, South Park, Thatcher Road, and/or Upper Downey Drive for its "carpool" lane but does not do so, this increasing traffic on Lower Downey Drive.

207.    Lower Downey Drive was already previously burdened as the public street with the primary "carpool" lane leading to the Smith School before the Borough adopted the Traffic Ordinances.

208.    The Traffic Ordinances are arbitrary and unreasonable in that they deprived plaintiffs of safe and unfettered access to the abutting public road that they had previously enjoyed.

35

209.    The Traffic Ordinances resulted in a net decrease in available street parking around the Smith School.

210.    The Traffic Ordinances have stigmatized the plaintiffs' property.

211.    Defendants have disregarded the concerns of plaintiffs and other similarly situated residents about the deprivation and interference with their rights.

212.    According to the Borough's Chief of Police and the Smith School Principal, the change in the traffic pattern on Lower Downey Drive from two-way to one-way was intended to be a temporary safety measure until a "sidewalk" was built on the south side of the street.

213.    Since a "sidewalk" was built on the south side of Lower Downey Drive, two-way traffic should now be restored completely on all of Lower Downey Drive, and not just on part of it.

**The Plaintiffs Have Also Been Deprived Of Their Right Of Ingress To Their Home**

214.    As a result of the defendants' actions, the plaintiffs have also lost rights of ingress that they had enjoyed prior to September 2010.

215.    Ordinance No. 10-19 has now literally created two different sets of traffic regulations on one street, giving Upper Downey Drive residents complete rights of egress and ingress from and to their homes from the east or west on a two-way street which has no parking on the north side and no "carpool" traffic.

216.    Lower Downey Drive, on the other hand, is now unapproachable from Upper Downey Drive during peak weekday hours as a result of Ordinance No. 10-19.

217.    When the plaintiffs return to their home from the George Washington Bridge, Fort Lee or Englewood and drive west on Upper Downey Drive to its intersection with Lower Downey Drive, the plaintiffs can visibly see their home just a few feet away, however, on school days between 8am and 4pm, plaintiffs are no longer permitted to continue west to their home.

218.    Instead, there is now a sign that the Borough placed or caused to be placed directly in front of the home of Gertrude Sockolow, a 92 year old widow who lives at 95 Downey Drive, which states that all traffic is one-way on school days during the hours of 8am to 4pm.

219.    This new traffic sign actually requires the plaintiffs to now drive away from their home and enter on to the Board of Education's road and then travel into the school's parking lot in order to get to their home.

220.    To reach their home from the east on Upper Downey Drive on school days between 8am and 4pm, plaintiffs must now pass through the Board of Education's Road and the Smith School Parking Lot and two stop signs and upon reaching Thatcher Road, head left (due south) and come to a third stop sign at the intersection of Thatcher Road and Downey Drive; then the plaintiffs must turn left again (due east) on to Downey Drive, the street where the journey began, and finally back to their home.

221.    This extended loop through the school's road and parking lot and past three stop signs effectively requires the plaintiffs to drive around the entire block and on and through the Board of Education's property.

222.    The alternative route of ingress to plaintiffs' home from the east on Upper Downey Drive for plaintiffs and their visitors is to drive west on Oak Street, and then north on Engle Street, a busy main thoroughfare with bus routes, and then east back on Downey Drive, a trip which adds approximately ½ mile to the journey, increase plaintiffs' fuel costs, risk of accident, and which adds mileage, and wear and tear to their vehicles.

223.    This lack of ingress has also devalued the plaintiffs' property since potential buyers will consider this as a strong negative factor in connection with any future purchasing decision.

224.    The traffic laws and plaintiffs' rights of ingress and egress should be restored back to the conditions that existed prior to the enactment of the traffic ordinances.

**The Borough Knew That The Ordinances Would Interfere With Plaintiffs' Rights But Failed To Give Direct Notice To Plaintiffs**

225. As a result of Ordinances 10-19 and 10-20, only nine families in Tenafly were deprived of

egress and ingress and their fundamental freedom of movement to leave their home on the adjoining

public street when they choose (the "Nine Homes"):

**NORTH SIDE**

95 DOWNEY DR - SOCKOLOW, GERTRUDE
93 DOWNEY DR - EINSIDLER, JON & KAREN FARNSWORTH
89 DOWNEY DR - BLUM, CONRAD B & CYNTHIA
83 DOWNEY DR – PLAINTIFFS (LANIN, SCOTT & LISA)
71 DOWNEY DR – GROSSMAN, JEFFREY & MICHELLE

**SOUTH SIDE**

92 DOWNEY DR – ACQUAH, MARIAN & SAMUEL
72 DOWNEY DR – LEBSON, MARTIN & JUDITH
68 DOWNEY DR – FINKLESTEIN, JUNE
62 DOWNEY DR – BARRET, THOMAS V. JR. & CHRISTINE R.

226. At all times, the Borough knew or should have known, and could readily identify the Nine

Homes from the tax map, tax records or by looking at the street, but failed to give these homeowners

any direct notice of the Borough's intention to consider and adopt the Traffic Ordinances.

227. In 2011, plaintiffs served requests under the Open Public Requests Act ("OPRA") for copies

of any notices sent to residents regarding the Traffic Ordinances, and, in response, the Borough

provided four unsigned and unsworn documents each entitled "Proof of Publication Affidavit", two

of which are dated 6/16/10 and two of which are dated as of 6/28/10.

228. According to the unsigned documents provided by the Borough, its Municipal Clerk Nancy

Hatten, purportedly provided public notice of Ordinance Nos. 10-19 and 10-20 by publishing notice

in the Bergen Record newspaper on 6/15/10 and 6/27/10.

229. According to the unsigned documents provided by the Borough, Ordinances Nos. 10-19 and

10-20 were introduced at a special meeting of the Mayor and Council on 6/10/10 and were to be

further considered for final passage after public hearing at a regular meeting of the Mayor and
Council on 6/12/10.

230.    To date, the Borough has failed to produce any proof of constructive newspaper notice to
residents of meetings and of the passage Ordinances 10-19 and 10-20 in compliance with the
publication requirements of the Open Public Meetings Act.

231.    The Borough has also failed to produce any proof of actual or direct notice to plaintiffs of the
alleged meetings on 6/10/10 and 6/12/10, its intention to enact Ordinances 10-19 and 10-20, or of
their adoption.

232.    The Borough violated the due process standard of the Fourteenth Amendment to the US
Constitution as set forth in Mullane v. Central Hanover Bank & Trust Co., 339 U. S. 306, 314 (1950)
because the Borough either gave no notice at all to the Nine Homes, including to the plaintiffs, of the
hearings on and the adoption of Ordinances 10-19 and 10-20 or only gave newspaper notice and, in
either case, failed to give notice that was reasonably calculated under all the circumstances to apprise
affected the parties and to afford them an opportunity to present their objections.

233.    The Borough's failure and willful refusal to directly notify the Nine Homes, including the
plaintiffs, also violates the spirit and intent of the New Jersey Open Public Meetings Act if not the
literal requirements of this law since the defendants' actions resulted in laws passed at "public"
meetings with no reasonable opportunity for plaintiffs to be heard.

234.    The lack of notice reasonably calculated to notify the Nine Homes, including the plaintiffs,
rendered the aforementioned Borough meetings non-public in contravention of the New Jersey Open
Public Meetings Act.

235.    To the extent that the defendants may rely on newspaper notice made under the provisions of
the New Jersey Open Public Meetings Act as a defense, the state statute should be declared to be

unconstitutional as applied to plaintiffs under these facts because it violates the plaintiffs' Due Process rights under the Fourteenth Amendment to the U.S. Constitution.

**The North Side Parking On Lower Downey Drive And The Unreasonable Traffic Conditions**

236. Downey Drive experiences a daily influx of school traffic during arrival and dismissal times on school days.

237. The Board of Education does not regulate its "carpool" lane or the conduct of drivers as they drive by the plaintiffs' property.

238. The Tenafly police do not regulate Lower Downey Drive during most school days because, upon information and belief, the police department does not have the manpower to assign an officer to monitor all of schools in Tenafly simultaneously during dismissal and arrival times.

239. Prior to September 2010, parents of students never parked on the north side of Lower Downey Drive (facing west) because all west-bound traffic was cut off by traffic cones during school arrival and dismissal times.

240. Since there were usually no cars parked on the north side of Downey Drive during school arrival and dismissal times prior to the Traffic Ordinances, the families in the Nine Homes, including plaintiffs, had the ability to maneuver out of their driveways and could exit west on Lower Downey Drive.

241. In connection with the Traffic Ordinances, the Borough shifted parking from the south side of Downey Drive to the north side in front of plaintiffs' home.

242. Under Ordinance 10-20, the Borough also eliminated parking on the north side of Upper Downey Drive (a street that also has no "carpool" traffic).

243. Prior to June 2010, Smith School directed parents to park their vehicles on Upper Downey Drive, Oak Street, Thatcher Road, and Leroy Street and not ever on the north side of Lower Downey Drive by plaintiff's home.

244.   In September 2010, in the Smith School's printed materials and directory, the school began to direct parents to park on the north side of Lower Downey Drive only in front of plaintiffs' home.

245.   The Board of Education's new parking policy combined with the Borough's Traffic Ordinances have impaired and restricted plaintiffs' freedom of movement, access to and from their home, and impeded, obstructed and interfered with and trespassed upon the plaintiffs' right of way and easement to use the public road that abuts their property and is a continuing violation of the plaintiffs' rights.

246.   The Borough and the Board of Education were both aware before the Traffic Ordinances were adopted that traffic volume was too high to filter through Lower Downey Drive in and around the plaintiffs' home.

247.   At a Joint Use Committee meeting held in or about April 2010, the Tenafly Police publicly expressed concern about the traffic volume on Lower Downey Drive.  See, Minutes of the Borough-Board of Education Joint Use Committee on 4/12/10.

248.   Yet, in June 2010, only two months later, the Borough adopted Ordinance 10-20 and shifted cars away from Upper Downey Drive to Lower Downey Drive.

249.   The traffic from the "carpool" lane, residential and commercial traffic, and the vehicles entering and exiting the new north side parking lane on Lower Downey Drive, have resulted in unreasonable traffic conditions that exist nowhere else on the entire East Hill, including several other streets that lead directly to the Smith School.

250.   Defendants' actions resulted in the wholesale shifting of the burdens of school traffic and parking away from one group of residents on Upper Downey Drive and Oak Street, including School Board member Jonathan Teall, to the Nine Homes on Lower Downey Drive and enhanced the property values of the former group at the expense of the latter one.

**The Borough's Traffic Plan Or Design Is Defective And Dangerous**

251.    Twice a day, as a result of the defendants' actions, there is a bottleneck where all lanes of moving vehicles (including cars exiting parked spots) are forced to travel directly in front of the Smith School, while many children wander close by, and to funnel into one lane.

252.    As a result of the defendants' policies, cars are now regularly parked on either side of the plaintiffs' driveway and are frequently blocking the plaintiffs' driveway during school hours.

253.    As a result of the chaotic and crowded traffic and parking conditions created by the Borough and the Board of Education, the plaintiffs' sightlines and passageways have been obstructed and narrowed at times making it very difficult for the plaintiffs to enter or back out of their driveway.

254.    During school days at certain times when they attempt to maneuver out of their driveway, the plaintiffs must use extreme caution in order to avert an accident.

255.    During school days at certain times, if the plaintiffs are able to navigate out of their driveway without incident, they must drive directly into the school traffic towards the Smith School and near the front of the school where there are many young children.

256.    In order to avoid this increased risk exposure, the plaintiffs are frequently forced to remain in their home and delay their departure.

257.    The traffic conditions imposed by the Borough and Board of Education have caused the plaintiffs to be anxious and nervous and fearful of hitting another car or child or causing property damage or injury to themselves or others.

258.    The traffic conditions created by the Borough and Board of Education, are dangerous, palpably unreasonable, are the result of a defective traffic design, and it is foreseeable that they will result in an accident or injury.

259.    The defendants refuse to take any action to modify the traffic conditions they have created on Lower Downey Drive near the plaintiffs' home.

260.    The traffic and "carpool" problem on Lower Downey Drive is further exacerbated in the Fall season when residents and their landscapers are directed to rake or blow piles of leaves into the street to be picked up by the Borough and there are piles of leaves that are several feet tall and many feet wide.

261.    When there are storms, broken branches are left piled up along Lower Downey Drive and obstruct the flow of traffic.

262.    The traffic and "carpool" problem on Lower Downey Drive is further exacerbated in the Winter season by snow conditions.

263.    Leaves in the Fall and snow in the Winter narrow the usable portion of Lower Downey Drive by the plaintiffs' home.

264.    Leaves and snow on Downey Drive are not removed by the Borough for extended periods of time and render it difficult for the street to function with its current traffic configuration.

265.    The Borough has made no provision to reduce or eliminate traffic or parking during times when there are leaves, branches, or snow on Lower Downey Drive, except once when emergency signs were put up.

266.    The traffic also interferes with plaintiffs' landscaper who can no longer readily access their home weekday mornings or afternoons.

267.    Upon information and belief, the Borough is now also considering a proposed ordinance that would prohibit landscapers from working at the plaintiffs' home on the weekend, which, if adopted, will unfairly restrict plaintiffs' ability to care for their lawn at all seven days a week.

268.    The increased traffic volume has also interfered with the Borough's garbage vehicles who cannot pass through the crowded street.

269.    Similarly, there have been times when the plaintiffs observed delivery trucks and mail trucks which were obstructed from passage by the traffic and parking.

43

270.     At no point in time prior to the adoption of Ordinances 10-19 and 10-20, did the Borough or

Board of Education discuss the traffic or parking changes with the plaintiffs or how it would

adversely impact their use and enjoyment of their home.

**The Police Emergency Order For "No Parking" On The North Side Of Lower Downey Drive**

271.     During the winter of 2010-2011, heavy snow obstructed the "carpool" traffic, vehicular

traffic, and north side parking on Lower Downey Drive.

272.     During the winter of 2010-2011, the Borough caused the snow to be plowed along the sides

of Lower Downey Drive and, as a result, cars that attempted to park on the north side of the street

were actually parking several feet off the curb and blocking traffic.

273.     During the winter of 2010-2011, plaintiffs attempted to clear their driveway of snow, a

strenuous job which often took hours, but the Borough plowed the snow right back in front of their

driveway obstructing ingress and egress and forcing the plaintiffs to re-shovel again.

274.     The Borough has a history of plowing snow in a manner that obstructs passage in an

adjoining alleged right of way.

275.     The parking, snow, and traffic conditions in the winter of 2010-2011 interfered with the

plaintiff's ability to enter or exit their driveways during school arrival and dismissal times.

276.     During the winter of 2010-2011, the Tenafly Police declared an emergency and put orange

"No Parking" signs along the north side of Lower Downey Drive directly in front of the plaintiffs'

home for approximately 2 months.

277.     Eliminating the parking on the north side of Lower Downey Drive made the plaintiffs'

driveway more accessible and caused the street traffic to flow smoothly.

278.     The Smith School continued to function without consequences from the temporary

elimination of the north side parking on Lower Downey Drive.

279.     The nearby Village of Ridgewood recently prohibited parking on a street which had a nearly

identical situation where parked cars from school personnel and students had left the street congested and unsafe and where school officials had encouraged using it as an alternative drop-off and pick-up location for students. North Jersey.com: News, 6/15/11.

280. The Borough of Tenafly should be directed to follow Ridgewood's precedent on Lower Downey Drive.

**Ordinance No. 10-19 Creates A Confusing Parking And Traffice Pattern**

281. Ordinance 10-19 requires that drivers parallel park on the driver's side (the left or north side) of the street, a difficult task to do safely on a street that already has heavy traffic during school arrival and dismissal times.

282. Under Ordinance No. 10-19, cars that are now parked legally facing east on the north side of the part of Lower Downey Drive between Thatcher Road and the Board of Education's road (in front of the Smith School) between 8:00 a.m. and 4:00 p.m. on school days automatically become illegally parked at 4:01 p.m. on those days unless they are turned around to face west because at that time the street reverts back to a two-way street, as it formerly used to be all the time.

283. Ordinance No. 10-19 creates a confusing situation where residents and visitors do not know which way to park legally and various cars park randomly facing opposite directions.

284. Some people park the wrong way facing east on Lower Downey Drive after 4pm on school days because they are using the street as if it is still one-way, even though it is designated as a two-way street after that time.

285. The Borough's apparent change in the traffic pattern to revert the western portion of Lower Downey Drive back to two-way traffic between Thatcher Road and Engle Street, created further confusion as cars continue to park incorrectly on the north side of the street facing the east (towards the Smith School) as they would if that portion of the street were still one-way.

286.    The random nature of vehicles parked facing both east and west on the same side of the street at various times on Lower Downey Drive has further stigmatized the street and has given it an appearance different from that of all other similar streets on the East Hill.

287.    Plaintiffs have also regularly observed vehicles approaching Lower Downey Drive from Upper Downey Drive during the hours of 8am to 4pm on school days and driving west on Lower Downey Drive in the wrong direction according to Ordinance 10-19, creating a random traffic pattern on the street.

288.    The Borough's conduct with respect to traffic on Lower Downey Drive has created uncertainty for drivers as to what the exact laws are concerning the flow of traffic and parking.

**The Borough Violated The First Amendment By Restricting Free Speech At Meetings Based On Non-Neutral Restrictions And Content Of The Speech**

289.    The Borough and the Board of Education and the members and participants of each body, have held numerous meetings and work sessions concerning the "carpool" traffic and the Student Drop-Off Pick Up Zone in the alleged right of way that the Borough claims over a 10 foot wide strip of land that abuts the home of plaintiffs and their neighbors alongside the curb line of Downey Drive.

290.    The Borough policy at its public meetings and work sessions deprived plaintiffs and residents of their protected right to Free Speech under the First Amendment to the U.S. Constitution.

291.    At the start of these public meetings, the Mayor routinely directed groups of citizens to have an impromptu election and to informally pick a representative to speak on behalf of other residents based on the mayor's perception that the citizens shared the identical interests based on the anticipated content of their speech and their proximity to Downey Drive.

292.    As a result, residents, including the plaintiffs, were forced against their will to engage in unlawful and unauthorized elections of one or more representatives from their neighborhood, on the record and in the open at public meetings, without confidentiality, when the plaintiffs and the other

residents desired to speak for themselves.

293.    In some instances, plaintiffs were actually chosen to speak for others and were compelled by the Borough to speak for an entire group that the plaintiffs did not lawfully represent and, in other instances, other residents purported to speak for the plaintiffs.

294.    The Borough heard the comments of such "representatives" as those of entire groups of residents including plaintiffs.

295.    As a consequence, the Borough censored and restricted constitutionally protected Free Speech based solely on its anticipated content and influenced the speech of those chosen to speak based on the belief that the residents would say the same thing, even when they did not actually have identical interests.

296.    The Borough typically lumped residents from Downey Drive and the surrounding neighborhood into one "sidewalk" opposition group which completely ignored the effect of the corresponding Traffic Ordinances and combined the families who have suffered interference with their freedom of movement and rights of egress with other families who have suffered no such deprivations, and then required them to select a representative to speak on behalf of the "group" that the Borough created.

297.    The Borough's speech policy at public meetings also included a restriction that those residents who were actually allowed to speak on behalf of their assigned "group" were limited to only three minutes.

298.    At all meetings actually attended by plaintiffs during several years, all of the barred speakers were behaving civilly and professionally, met all rules of decorum, and none were accused of seeking to assert disruptive, abusive or offensive language or irrelevant comments.

299.    Free speech rights during public comment time for private citizens at council meetings receive heightened protection and municipal restrictions must be content neutral.

300. Free speech is essential to our system of government.

301. Determining that certain residents may not speak, or directing one resident to speak on behalf of another based solely on the content of their anticipated speech, violates the First Amendment to the U.S. Constitution.

302. A three minute speaking rule at public meetings rule muzzles and has chilling effect on free speech, even more so, under these circumstances, where one unelected person from a neighborhood is compelled to speak on behalf of a group of residents who may have diverging views or disparate concerns and perspectives and other residents are not allowed to speak at all.

303. When First Amendment interests are threatened or impaired by public office holders, the loss of these freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury entitling a plaintiff to injunctive relief.

304. The Borough's actions have created an environment where plaintiffs and other residents cannot participate in the political process or protect their rights in any meaningful way without judicial intervention.

305. The Borough's actions unlawfully caused and are continuing to cause plaintiffs harm and all actions taken at, in connection with, or based upon, such meetings, should be declared void and an injunction directing the defendants to immediately cease and desist from obstructing and interfering with Free Speech.

**The Borough and The Board Of Education Failed To Give Plaintiffs**
**Direct Notice Of Public Meetings Regarding The Alleged Right Of Way**

306. As with the meetings concerning Traffic Ordinances Nos. 10-19 and 10-20 described above, the Borough also failed to give the plaintiffs any direct notice of <u>any</u> public meetings they held concerning proposed construction in an alleged right of way on or near plaintiffs' property.

307. The Borough knew, or should have known, and could readily ascertain at all times, the identity of the plaintiffs and the few other residents directly affected by the defendant's actions.

48

308.   The plaintiffs attended some meetings on the subject of the defendants' use of an alleged right of way on Downey Drive when plaintiffs learned of the meeting in advance by word of mouth from neighbors.

309.   Upon information and belief, plaintiffs missed other important public meetings between the years 2005 and 2012 concerning the use of an alleged right of way on Downey Drive on or near their property that affected their property rights because plaintiffs were never directly notified by the defendants about the public meetings and were unaware of them, and therefore, were not given a fair opportunity to participate in meetings where plaintiffs' rights were directly or indirectly at stake.

**The Defendants Conducted Business By Email In
Violation Of The New Jersey Open Public Meetings Act**

310.   There is a casual lack of transparency at Council meetings in Tenafly which leads the plaintiffs and many residents to believe that the Borough conducts official business and debates public matters in private by email, in closed sessions, and/or backroom deals.

311.   This perception is confirmed by the Council member's past use of email when interacting with plaintiffs themselves and by the defendants' blanket refusal to produce email records in response to OPRA requests by the plaintiffs concerning the Smith School "carpool" traffic on Downey Drive and related matters.

312.   In 2011, plaintiffs served demands on the Borough to request records regarding the Smith School "carpool" traffic and related matters, including emails by and between the defendants concerning those matters.

313.   The Borough responded late and with a partial response and refused to produce any email records on the ground that it would have to search through 5,000,000 emails.

314.   The Borough demanded the sum of $94,000 to search its emails and refused to produce any email records at all.

315.   The Borough's blanket refusal and response to the request for emails was untimely under and

in violation of state law.

316.    The stated basis for this blanket refusal to produce any email records confirmed that the Borough has conducted and conducts official business in private by email.

317.    In connection with the Borough's IT Committee and IT agreements, the Borough has recently publicly expressed concerns about the use of official and personal email.

318.    Deliberations by the Council via email of municipal action by a quorum of municipal officials about government business violates the New Jersey Open Public Meetings Act (known as the Sunshine Law).

319.    The use by Borough officials of their private or official email accounts to discuss official matters is the equivalent of an unannounced electronic meeting and is used as a method of seeking votes through a process that is hidden from the public and is highly questionable.

320.    To the extent that the Council has engaged in such backroom deliberations in violation of the Sunshine Law, the corresponding meetings were a pretense, devoid of any meaningful public debate or deliberation, where the residents who were allowed to speak, either individually or as a group, went through the futile effort of speaking to a council who had already made their decision in secret.

321.    The Borough has admitted that emails exist on a massive scale in violation of the Sunshine Law and then used the enormity of its own emails as a shield to demand exorbitant sums.

322.    The public has a right to know about deliberations by the Borough about official and public matters and to the extent that such secret deliberations resulted in ordinances or official action that affected the plaintiffs' rights, such ordinances and official action should be declared null and void and the defendants should be enjoined from taking any steps in furtherance of them and from continuing this practice.

323.    The Board of Education has likewise refused to produce even a single email regarding the matters at issue in this action and, upon information and belief, has also conducted public business in

private.

324.    On or about 6/13/11, plaintiffs served a similar OPRA request upon the Board of Education requesting records regarding the Smith School "carpool" traffic and related matters, including emails by and between the defendants concerning these matters.

325.    On or about 6/29/11, the Board of Education willfully failed and refused to respond to many requests and asserted a blanket refusal to produce any of its email records suggesting that it would have to search through "hundreds of thousands" of emails.

326.    The Board of Education's basis for refusing to produce emails confirms that at least some of the Board members have engaged in private closed discussions by email on official matters.

327.    Accordingly, the Board of Education violated the New Jersey Open Public Meetings Act by using email as their form to discuss and debate their official business.

328.    The Borough and Board of Education should be enjoined from using email for any on-going or future official business and should be directed to disclose the emails they used for any official business.

**The Defendants' Conflict Of Interest And the Joint Actions Of The Defendants**

329.    The Borough allowed the debate regarding "carpool" traffic, parking and the use of an alleged right of way to be co-opted by a few parties with inroads into the Council and Mayor, including members of the Board of Education and the HSA, the school's parent association.

330.    Upon information and belief, in or about 2004 for the purpose of addressing "carpool" traffic, the Tenafly Police issued a proposal for a sidewalk in an alleged right of way adjacent to property owned by Board of Education member, John Teall, located at 110 Downey Drive, Tenafly, NJ 07670.  A copy of this proposal with maps is incorporated by reference and annexed hereto as Exhibit "C".

331.    The portion of the street in front of 110 Downey Drive has been designated by the Borough

51

and/or Board of Education as a "virtual" walking zone on the East Hill for pedestrians traveling to and from the Smith School and there is a crossing guard stationed there every day in an area of the street that is cut off by traffic cones.

332.    110 Downey Drive is located at the intersection of Oak Street and Upper Downey Drive, both being public streets that feed into the Smith School, and is located literally in the center of this controversy.

333.    John Teall has and had a conflict of interest as a member of the Board of Education based on his direct pecuniary and property interest in the matters that were under consideration by the body that he was elected to, including the Smith School pedestrian and vehicular traffic directly in front of his own home.

334.    Mr. Teall has and had an interest in influencing the votes of the Board of Education and of the Borough's council in order to minimize the impact of school vehicular and pedestrian traffic on the use and value of his property and to divert and redirect the vehicular and pedestrian traffic away from his property and towards the plaintiffs' home and Lower Downey Drive.

335.    Regardless of whether Mr. Teall actually used his official position to influence the outcome of the defendants' actions and policies, his private interests clashed with his public duties and this created an actual conflict of interest.

336.    Mr. Teall should have recused himself or been disqualified and his participation as an official was conflicted and has tainted the whole process.

337.    The Board of Education and the Borough were aware of this conflict at all relevant times and allowed Mr. Teall to actively and openly participate, comment, and influence voting on these matters.

338.    Defendants owed a fiduciary duty to the plaintiffs and residents of Tenafly not to allow a conflicted member to participate in this process, engage in self-dealing, or use any part of public

52

funds for the personal benefit of a member of the governing body.

339.   Defendants breached their duty by allowing this to occur.

340.   The defendant Board of Education and the Borough formed and continue to use a Joint Use Committee to review the Student Drop-off Pick Up Zone, the Smith School "carpool" traffic and the use of the alleged right of way on Downey Drive.

341.   Upon information and belief, the Borough has sought and continues to seek advice from and the recommendation of the Board of Education on issues relating to the "carpool" traffic and Downey Drive.

342.   At some point during the defendants' joint meetings, the sidewalk that had been proposed in 2004 in front of Mr. Teall's home had been removed and was no longer included on any proposed drawings, while all traffic continued to be diverted away from his home.

343.   According to minutes of regular public meeting of the Board of Education held on 8/24/10 (the "8/24/10 Minutes), which were produced by the Board of Education in response to a request for records under the Open Public Records Act, the Board of Education passed "Resolution A-3 Approval to Support the Borough in Creating a Sidewalk on Downey Drive."

344.   This meeting and, in fact, all public meetings held by the Board of Education on this topic, were held without any direct notice to plaintiffs who were known to the Board of Education as residents who would be directly or indirectly affected.

345.   The failure of the Board of Education to give plaintiffs such notice was a violation of due process under the Fourteenth Amendment to the U.S. Constitution and also violates the spirit and intent of the New Jersey Open Meeting Act, if not its literal terms.

346.   Accordingly to the 8/24/10 minutes, Resolution A-3 ("Approval to Support the Borough in Creating a Sidewalk on Downey Drive") was passed by the Board of Education and Board member Jonathan Teall voted in favor of this resolution which limited construction in the alleged right of way

53

to the portion of Downey Drive from the Board of Education property to the intersection with

Thatcher Road and not in front of his own home.

347.    The 8/24/10 Minutes for Resolution A-3 reference the 2004 recommendation of the

Borough's Police Chief which had previously included a proposal for construction of a sidewalk in

front of Mr. Teall's home.

348.    The 8/24/10 Minutes also confirmed, as the Tenafly Police Chief indicated, that the

construction in front of the homes of private residents was not for students to walk to school but was

limited to solving traffic problems:

> "... this is not about student walkers or trying to increase students who walk to school; but it
> is about creating a safe environment for the community who must use the street as an access
> to the school."

349.    The 8/24/10 Minutes also reference the traffic changes that caused the plaintiffs to become

landlocked with restricted access to the abutting public street in front of their own home, including a

prohibition against parking on the north side of Oak Street (which now has no "carpool" traffic, no

sidewalks, and restricted parking), the one-way traffic regulation on Lower Downey Drive between

the hours of 8 AM and 4 PM during school days, and the new arrangement for parking on the north

side of Lower Downey Drive.

350.    The 8/24/10 Minutes also reference the closing of the traffic circle directly in front of the

Smith School which reduced the available frontage on the Board of Education's own property that

was available for vehicles to drop off and pick up children and which has redirected more vehicular

traffic off of school grounds and on to Lower Downey Drive in front of plaintiffs' property.

351.    According to a letter dated August 2010 and from the Smith School Principal to parents, a

copy of which was produced in response to a request under the Open Public Records Act, parents

were advised that Lower Downey Drive was a one-way street on school days from 8:00 A.M. to 4:00

P.M; the traffic circle in front of the school was closed to traffic; and that parents who wish to walk

their children to the school door "must park on the north side of Downey Drive (odd-numbered

addresses)."

352.    Through their actions, the Board of Education and the Borough jointly facilitated, created, and conspired to create, the very conditions that have interfered with and obstructed the plaintiff's rights.

353.    The Board of Education also demonstrated a clear intent in its meetings and in Joint Use Committee Meetings to shift its burden of supervising schoolchildren to nearby residents.

354.    The Board of Education has extended and further seeks to extend its property to off school grounds along Lower Downey Drive without assuming any of the corresponding responsibilities, including providing for insurance or indemnification to plaintiffs and nearby residents or make arrangements for the removal of snow.


**Resolution A3 Is Invalid Because A Board Member Has A Disqualifying Conflict Of Interest**

355.    Board of Education Resolution A-3 is invalid because Board member Jonathan Teall has a disqualifying conflict of interest and he should have recused himself and been removed from the process.

356.    Any other similar resolutions which are currently unknown to plaintiffs but which may have been passed by the Board of Education with respect to the use of the alleged right of way on Downey Drive and the Smith School "carpool" traffic are also void and invalid if Mr. Teall was permitted to participate, influence, or vote on those resolutions.

357.    Where a member of a school board possesses a disqualifying conflict of interest, any voting on the subject by the board is invalid under common law and violates N.J.S. Title 18A Education – 18A:12-24, entitled "Conflicts of Interest".

358.    Section 0163 of the Bylaws of the Board of Education provide that:

> "The Board of Education recognizes that there may be matters that
> come before the Board or acts required of Board members in their

55

> official capacity where the Board member may have a conflict of
> interest or the act would be in violation of N.J.S.A. 18A:12-24. In
> these matters, the Board member(s) will remove himself/herself from
> any discussions, meetings (informal or formal), committee meetings,
> and/or a vote regarding the matter. The Board will consider this
> matter without the Board member(s) who has the conflict."

359.    The fact that there might have been sufficient votes in the board member's absence to support actions that were taken and the failure of anyone to object to the conflict does not alter the necessary outcome: the infection of the conflict is deemed to have spread so that the action of the whole body is voidable.

360.    The Borough and the Board of Education, acting jointly in the place of the Tenafly Planning Board and/or Zoning Board of Adjustment to determine a land use, also had and shared a conflict of interest as a result of Mr. Teall's involvement, in violation of the Borough's Ordinance No. 35-501, found under Land Development Regulations, Article XXXV.

**The Borough's Ordinances 10-19, 10-20 And 10-22 Are Invalid Due to Conflict Of Interest**

361.    Upon information and belief, in or about July and August, 2011 the Borough passed Ordinance No. 10-22 and took other actions to approve and fund construction of a sidewalk on the south side of Downey Drive running from Smith School to Engle Street.

362.    In connection with Ordinance Nos. 10-19 (traffic) 10-20 (parking) and 10-22 (sidewalk) the Borough relied upon, consulted with, conspired and made joint decisions with the Board of Education regarding the Smith School "carpool" traffic, the Student Drop-Off Pick Up Zone, and the alleged right of way.

363.    The defendants created a Joint Use Committee where the Borough and the Board of Education coordinated their actions and discussed and formally and informally worked out what to do about matters directly affecting the plaintiffs.

364.    Upon information and belief, the defendants have communicated with each other and others by email regarding the "carpool" traffic, alleged right of way, the school vehicular loading zone, and

matters that directly affected the plaintiffs' home and property rights and the surrounding area near plaintiffs' home, including matters that were at the time under deliberation and open to public debate and voting to take official action.

365.    At all times, the Borough was, or should have been aware that its partner, the Board of Education, had a conflict of interest that would invalidate their joint actions in connection with Ordinance Nos. 10-19, 10-20, and 10-22.

**The Tenafly Tax Map Does Not Create Any Right of Way On Downey Drive**

366.    The Borough claims a paper right of way along a ten foot strip of land which abuts Downey Drive on the north side by the plaintiffs' adjacent lot and also makes the same claim on the south side of the street.

367.    Upon information and belief, the last recorded owners of the land in the alleged right of way were Charles H. Reis and his wife Margaret J. Reis.

368.    Upon information and belief, Charles H. Reis was the original developer and subdivided the neighborhood in 1951.

369.    Upon information and belief, in the 61 years since the 1951 subdivision, the alleged right of way in front of the plaintiffs' home has never been used as a right of way by the defendant Borough for sidewalks, dirt walking paths, or signage.

370.    The controversy over a paper right of way on Downey Drive began with respect to the Borough's attempt to use an alleged right of way in front of two properties located at 92 Downey Drive and owned by Dr. Sam and Dr. Marian Acquah (who live directly across the street from the plaintiffs on the south side of Downey Drive) and 94 Downey Drive, then owned by Adeline Applebaum.

371.    The Acquahs objected to the Borough's proposed construction within the alleged right of way adjacent to their property.

372.   The Borough also claims that it has an alleged right of way in front of the plaintiffs' property at 83 Downey Drive.

373.   Plaintiff Scott Lanin went to the Borough municipal tax assessor's office to find out the basis for the alleged right of way and was told that there exists a tax map of the Borough which shows Downey Drive to be 50 feet wide on paper.

374.   Upon information and belief, Downey Drive was actually constructed at approximately 30' wide.

375.   The Borough's tax map was created by the Borough itself.

376.   The Borough's tax map does not contain any marking or indications that the physical width of Downey Drive as constructed is less than the paper width as marked on the map.

377.   The absence of any indication on the Borough's tax map to distinguish the physical width and the paper map width of Downey Drive would reasonably lead one to believe that the physical and the paper map widths are the same.

378.   The discrepancy between the physical width and the paper map width of Downey Drive can only be discovered by measuring the street by hand.

379.   The Borough's tax map does not contain any marking to delineate the existence of an undeveloped right of way parallel to Downey Drive.

380.   The Borough municipal tax assessor advised plaintiff that there is no specific agreement that established a right of way on Downey Drive.

381.   In May 2011, an OPRA request was made by plaintiffs upon the Borough for:

> "All documents, ordinances, regulations or laws that created or establish the
> alleged "right of way" or easement on Downey Drive that Tenafly relies upon
> as the basis for construction of a sidewalk on the south side of the street."

382.   Defendant Borough responded in writing on 5/6/11 as follows by referencing its own tax map again and by also referencing a map and alleged deed said to have been filed with the Bergen County Clerk:

"#4, #5, & #6 – Right of Way documentation: A copy of Sheet 20 of the Tenafly Tax Map showing the right-of-way of Downey Drive at 50' wide. The mapping and deeds establishing the right-of-way would be on file in the Bergen County Clerk's Office in the deed vault and map room. (emphasis added)"

383.    The Borough produced a copy of its own tax map but did not actually produce any

"mapping and deeds" to support its alleged right of way.

384.    The Borough's tax map contains no grantor/grantee language devolving ownership rights to

the street from Mr. Reis or Mrs. Reis, as the last record owners, to the Borough.

385.    The Borough's tax map does not qualify as a deed because it does not specifically identify

what real property is being conveyed, does not identify the grantors or grantee, does not contain

granting language of any kind, and is not signed by any grantors.

**The Borough Never Obtained A Dedication Deed For The Alleged
Right Of Way On Downey Drive From The Property Owner Charles Reis**

386.    Upon information and belief, there is no recorded deed or deed of dedication from Mr. Reis

and Mrs. Reis conveying an alleged right of way on Downey Drive to the Borough.

387.    Upon information and belief, there is no recorded document which grants to the Borough a

right of way on Downey Drive.

388.    According to the New Jersey Association of County Tax Boards website, the Borough has in

fact recorded deeds for other properties within its geographical boundaries that it claims to own or

have the right-of-way in.

389.    According to the New Jersey Association of County Tax Boards, the Borough has recorded a

public right of way on Buff Road for Block 201 Lot 5, a right of way on Knickerbocker Road for

Block 121 Lot 16, and an easement on Buff Road for Block 208 Lot 5, as well as other deeds.

390.    The Borough's practice of recording deeds for rights only some of the time creates confusion

in the public records.

391.    The Borough's practice of recording deeds for rights only some of the time defeats the purpose of the New Jersey recording statute which is intended to give public notice of rights and interests in real property.

**The Subdivision Map And The Sale Of Lots Did Not Convey Any Right Of Way
To The Borough On Downey Drive By Constructive Or Implied Dedication**

392.    Upon information and belief, the original subdivision map for plaintiffs' property and the surrounding streets was drafted in or about 1951 and is identified as map #3904 in the Bergen County Clerk's Office (the "Subdivision Map").

393.    The Subdivision Map is not a deed or conveyance of real estate.

394.    The Subdivision Map contains no grantor/grantee language devolving ownership rights to the street from Mr. Reis or Mrs. Reis, as the last record owners, to the either defendant.

395.    The Subdivision Map does not convey any right of way to the Borough.

396.    Upon information and belief, Charles Reis was a builder or developer in Bergen County and, in particular, River Edge and Tenafly.

397.    In 1949 and 1950, when Mr. and Mrs. Reis dedicated a public street and rights of way to a municipality, they did so by signing a deed to specifically convey their interest in the street and right of way to the municipality and not solely by filing a subdivision map and selling lots.

398.    In 1945, according to a subdivision map number 3415 and filed in the Bergen County Clerk's Office, Mr. Reis created a community called "Clarendon Hills" in the borough of River Edge.

399.    The plaintiffs' neighborhood which was created in or about 1951 in Tenafly was also called "Clarendon Hills" according to the original Subdivision Map.

400.    A search of the Bergen County Clerk has disclosed at least seven public streets and sidewalks that were dedicated by deed from Mr. and Mrs. Reis to the Borough of River Edge in 1949 and 1950, even though there already was a subdivision map filed in or about 1945:

60